Thomas W. LEACH, Plaintiff, Appellant and
Cross-Respondent,

v.

J. M. KELSCH, Defendant, Respondent
and Cross-Appellant.

No. 7887.

Supreme Court of North Dakota.

Oct. 11, 1960.

Rehearing Denied Dec. 16, 1960.

Jansonius, Fleck, Smith, Mather, & Strutz, Bismarck, Lord, Ulmer, Bair & Daner, Mandan, of counsel, for plaintiff, appellant and cross-respondent.

Conmy, Donahue & Conmy, Bismarck, for defendant, respondent and cross-appellant.

CLIFFORD SCHNELLER, District Judge.

Plaintiff brings this action sounding in trover and conversion, alleging that he is the owner of 3,600 shares of stock in North American Royalties, Inc., a Delaware corporation, which defendant has wrongfully withheld from him and converted, and demanding judgment for the highest value of such stock between the date of conversion and the date of trial together with the costs incurred in pursuit of said stock.

The defendant's answer, summarized as briefly as a fair statement permits, denies any conversion on the part of the defendant of any stock owned by the plaintiff, alleges that plaintiff's claim was based upon a purported contract for which there was no consideration, further alleges fraud, undue influence and coercion on the part of plaintiff toward the defendant, then sets forth a long, factual situation from his viewpoint, which facts are unnecessary to set out here, as they will be discussed later in this opinion. Defendant answered further by alleging a breach of trust on the part of plaintiff, and that any oral contract between the parties relative to such stock is void as against public policy.

The defendant demanded a trial by jury and the action was tried before the court and jury.

At the conclusion of all of the testimony the plaintiff moved for a directed verdict in his favor, as did the defendant for a directed verdict in his favor, both motions being denied by the trial court.

The case was submitted to the jury, who were unable to agree upon a verdict and were discharged by the trial court.

In accordance with Paragraph (b) of Rule 50 of the North Dakota Rules of Civil Procedure, both parties moved for judgment in accordance with their motions for directed verdict. The trial court denied both motions. Plaintiff appealed from the order denying his motion, and demanded a trial de novo in this court. Defendant filed a cross-appeal from the order denying his motion, and also demanded a trial de novo in this court.

Provision for trials anew or de novo in the Supreme Court is contained in Section 28–2732, NDRC 1943. This section applies only to actions tried and decided by the court without a jury and has no application here. Consequently we are unable to try this case anew. However, we are required under Paragraph 5 of Section 28–2702, NDRC 1943, to determine whether it was error for the trial court to deny the motion of plaintiff or defendant for judgment in accordance with the respective motions for directed verdict.

To pass upon the orders appealed from, it is necessary to set forth the facts shown by the record to determine whether the motion of either of the parties for a directed verdict should have been granted by the trial court. Smith v. Knutson, 76 N.D. 375, 36 N.W.2d 323.

A motion for judgment notwithstanding the verdict calls for a review of the trial court's ruling in denying a motion for directed verdict. Westerso v. City of Williston, 77 N.D. 251, 42 N.W.2d 429, and cases cited therein.

"If no verdict was returned, the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial." Rule 50(b), N.D.R.Civ.P.

This rule is the basis for the present motions for judgment notwithstanding the disagreement of the jury. The scope of review from the court's order denying the motions is the same as if the motion were one for judgment notwithstanding the

verdict. Neither motion should be granted unless the moving party is entitled to judgment on the merits as a matter of law. Olson v. Cass County Elec. Coop., Inc., N.D., 94 N.W.2d 506.

The plaintiff and defendant formed a partnership in 1950 or 1951 to deal in oil and mineral leases and royalties and for the drilling for oil and gas. Plaintiff had been engaged in this type of business since 1920. Defendant was a successful rancher, dealing in purebred livestock and selling and buying the same in North Dakota and other states of the Union. After four or five years of partnership operations, the parties decided to dissolve the partnership and divide their respective interests therein and to form corporations mainly owned and controlled by themselves and their wives. To that end plaintiff formed Northern Oil Company and Leach Oil Corporation, and defendant formed Northwest Oil Company. The plaintiff and his wife, with the exception of a few qualifying shares, owned Northern Oil Company and Leach Oil Corporation, and defendant and his wife, except for a few qualifying shares, owned Northwest Oil Company. The divided property of the partnership was placed by the parties in their respective corporations. Plaintiff and defendant together with others organized North American Royalties, Inc., a Delaware Corporation, as a holding company owning oil, gas and royalty interests in mineral property but not doing business as an operating company exploring for gas and oil. North American Royalties, Inc., became listed on the American Stock Exchange and its stock was bought and sold on the open market and had a day-to-day market value. The plaintiff became president, treasurer and a director of North American Royalties, Inc., and defendant became its vice-president and secretary and a director. In 1959 there were 16,000 to 20,000 individual stockholders in this company.

Sometime in late 1956 the parties talked about conveying the assets of Northern Oil, Leach Oil, and Northwest Oil to North American Royalties, taking in return stock in that company. This was thought to be of benefit to all concerned, for the parties hereto would then own stock having a market value and North American Royalties could expand by absorbing the cash assets of the other corporations and become an operating company exploring for gas and oil. This preliminary talk in 1956 culminated in a meeting in New York City in the early spring of 1957 with both parties in attendance. The proposition was talked over with the attorneys for North American Royalties, Inc. and officials of that company, and it was decided that an independent appraiser versed in the values of mineral rights, leases, and producing oil properties was to be appointed who would appraise the properties of the corporations owned by the parties, and that if the appraisal proved acceptable the tentative offer of North American Royalties to take over the assets of the corporations belonging to the parties would be completed with a cut-off date as of May 31, 1957, after which date all assets acquired by the corporations belonging to the parties would vest in North American Royalties and all their liabilities would be absorbed by North American Royalties.

In accordance with the tentative arrangements, C. T. Jones of Tulsa, Oklahoma, was appointed as the appraiser to appraise the property of Leach Oil, Northern Oil, and Northwest Oil. The appraiser's values of these properties were in the hands of the parties sometime prior to July 23, 1957. On July 23, 1957, the plaintiff contacted the defendant and informed him that the appraiser's values of his oil-producing properties were too low by comparison with the values accorded defendant's non-producing properties, and further stated to the defendant that there would have to be an adjustment of these values as between themselves.

On July 24, 1957, a further meeting took place between the parties, and was attended by a Mr. Zimmerman and a Mr. Donlin. The plaintiff at that time presented figures to the defendant, which figures showed a

claimed inequity in the values arrived at by the appraiser as between the properties of plaintiff's corporations and defendant's corporation, and the plaintiff then informed defendant that this inequity figured to 3,608 shares of stock of North American Royalties, Inc. Plaintiff further stated that unless defendant would turn over to him 3,600 shares of North American Royalties stock after they were issued to defendant's corporation in exchange for the properties of the corporation he would not put his corporations into the deal. Defendant then inquired of plaintiff if he would accept 3,500 shares. Plaintiff refused and insisted that 3,600 shares was his figure. Whereupon the defendant replied, "If that's it, that's it." On the same day Mr. Donlin, who attended the meeting and who was an officer of North American Royalties and who was a partner of defendant in other business interests than those mentioned herein, wrote the New York attorneys of North American Royalties a letter, and we quote from the relevant portions of such letter:

"We would like to have your opinion of the tax consequences of a recent transaction between Tom and John which will result in Tom receiving 3600 shares of North American stock from John after the merger of Northwest Oil Corporation with North American.

"We would like to be assured that this transaction will not adversely affect the tax free character of the merger of North American, Leach Oil Corp., Northern Oil Company, and Northwest Oil Corporation.

"After viewing the appraisal of C. T. Jones it was determined that, although the appraisal accurately reflected the relative values as between the combined Leach and Kelsch interests and the North American Stockholders, the appraisal did not accurately reflect relative values as between Leach and Kelsch. In order to correct the inequity resulting from this fact, Tom and John agreed that Tom should re-

ceive 3600 shares of North American Royalties stock which would otherwise be owned by John. In order to accomplish this it was decided that John should hold 1548 shares of Northwest Oil Corporation stock in trust for Tom.

"How should this transaction be treated on both Tom's and John's tax returns?"

A copy of this letter was placed on defendant's desk, he read it and made no objection to its contents. It is to be noted that the inequities claimed by plaintiff between his and defendant's corporate assets did not change the overall value of the corporate properties that were contemplated to be exchanged for North American Royalties stock. Further, it was conceded by both parties in their evidence that either of the parties could withdraw from the proposed exchange of properties for North American Royalties stock at any time prior to final acceptance of the proposed deal by the stockholders of North American Royalties, and that the tentative arrangements would not become final until approved by the stockholders of North American Royalties, and it must have the assets of all three corporations to consummate the proposed agreement.

On August 29, 1957, North American Royalties, under the sole hand of defendant as secretary, issued a notice of a special meeting of its stockholders to be held on September 25, 1957, in New York City for the purpose of voting on the proposed transaction. Attached to the notice was a detailed statement of the purposes of the meeting together with an informative word picture of the properties of Leach Oil, Northern Oil, and Northwest Oil, their stockholders, and the reasons for the proposed purchase of their assets by North American Royalties. In this informative statement plaintiff is listed as a stockholder in Northwest Oil to the extent of owning 6.23% of the stock in that corporation. Prior to the conversations of July 23 and July 24, 1957, the plaintiff had no interest

whatsoever as a stockholder or otherwise in Northwest Oil. The percentage of 6.23% of the stock in Northwest Oil figured out on the exchange basis to approximately 3,600 shares of North American Royalties stock. The statement provided further that North American Royalties did not propose to proceed with any one of the above companies without combining with all, and that the stockholders of Leach Oil, Northern Oil and Northwest Oil were reserving the right to vote their shares against the proposition of combining if it were inadvisable for them to proceed with the combination. At the stockholders meeting a favorable vote of the voting stock was received for the combination, and immediately thereafter the parties hereto agreed in writing to turn over the assets of their corporations in exchange for a specified number of shares of North American Royalties, and did, in accordance with their signed statements, turn over the assets of their respective corporations to North American Royalties. This left nothing further to be done except the issuance by the stock transfer agent of the agreed amount of stock of North American Royalties to the three corporations owned by the parties. This was accomplished on November 15, 1957. In the meantime, and on October 21, 1957, defendant informed plaintiff that he would not deliver to him the 3,600 shares of stock in North American Royalties and if he wanted that stock he would have to sue for it.

Prior to the trial of this action defendant sold the 3,600 shares of stock in North American Royalties which were a part of the total stock that his company had received as a result of the combination agreement. The undisputed proof was that the highest market value of the North American Royalties stock between the date of the alleged conversion and the date of the trial was $5.62½ a share.

Defendant concedes that at no time did he voice any objection to the informative statement sent to the stockholders of North American Royalties showing plaintiff to be the owner of a 6.23% interest in the stock of Northwest Oil, equivalent on the exchange basis to approximately 3,600 shares of stock in North American Royalties.

The record discloses that defendant was indebted to plaintiff on a promissory note for a large sum of money; however, defendant admitted that at the time of his conversations with plaintiff on July 23 and July 24, 1957 the note was not due and was never brought into the conversation.

It is apparent from the facts that an agreement was reached between the parties for defendant's corporation after receipt of the North American Royalties stock shares to transfer to plaintiff 3,600 shares of stock. To attain the result sought by the parties, the mechanics of the contract was worked out by showing plaintiff to be the owner of an interest to the extent of 6.23% of the stock in Northwest Oil Company, equivalent on the combination agreement to approximately 3,600 shares of North American Royalties stock. The tax situation without doubt influenced this manner of handling the details of the agreement between the parties.

Under the state of facts related, defendant's contentions are that there was no conversion; that if there was an agreement between the parties it was induced by fraud, undue influence and coercion exercised by the plaintiff upon the defendant; that there was no consideration for the agreement, and it was against public policy and void.

"The essence of conversoin is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner, * * * The law of conversion * * * is concerned with possession, not title, conversion being an offense against possession of property. It may be either direct or constructive, and may be proved directly or by inference." 89 C.J.S. Trover and Conversion § 3.

"A conversion consists of an act in derogation of the plaintiff's possessory

rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion." 53 Am.Jur., Trover & Conversion, Section 29.

"As a general rule the wrongful sale of personal property in which another has an interest renders the seller liable for the conversion of that interest. * * * 'That a tenant in common may maintain an action against a co-tenant to recover the value of a joint interest in personal property, to the actual possession of which he is entitled, at a time when his rights of ownership and possession are denied and ignored in a manner which deprives him of the possibility of any enjoyment thereof or benefit therefrom, is supported by both reason and authority.'" Hochstetler v. Graber, 78 N.D. 90, 48 N.W. 2d 15, 18.

There can be no question under the agreement arrived at between the parties but that plaintiff acquired 3,600 shares of stock of North American Royalties which were delivered to defendant's corporation and in turn taken, possessed and sold by him, which in turn deprived the plaintiff of the right of ownership and possession of this stock and deprived him of any enjoyment or benefit therefrom.

Regarding the question of fraud, undue influence and coercion, the trial court, in his memorandum decision passing upon the motions made for judgment in accordance with the motions for directed verdict, makes the following statement: "We are not here dealing with ignorant, unlettered, inexperienced, or incompetent persons. The parties to this action are men of middle age, intelligent, vigorous, dynamic, crafty, keen men, experienced especially in investments, corporate promotions, and transactions involving all kinds of oil or petroleum interests * * *. At the close of the trial the court on the insistence of defendant submitted the question of fraud, etc. to the jury without any objection on the part of the plaintiff, but there was no fraud proved."

We find no evidence whatsoever in the record to support the defendant's contention that the agreement arrived at between the parties was induced by fraud, undue influence or coercion.

■ To constitute actionable fraud the representations must be made with knowledge of their falsity and with intent to deceive. It is also true that the plaintiff must show that he relied upon the representations made. See Coman v. Williams, N.D., 65 N.W.2d 377.

■ Fraud is not presumed but must be proved. Chester v. Einarson, 76 N.D. 205, 34 N.W.2d 418, 35 N.W.2d 137.

■ If any false representations made by the plaintiff to the defendant relative to the respective value of their corporate holdings were made, the defendant had as much knowledge as plaintiff of the property involved and its values, having the appraiser's values accessible to him, and his own undoubted knowledge of the values of the properties involved. It is evident from the record that even though plaintiff's statements to defendant as to the respective values of the property of their corporations were untrue, defendant had full knowledge of any falsity in these statements and in spite of them saw an advantage to himself in obtaining marketable stock for the properties of his corporation even though having to agree to deliver additional stock of North American Royalties to plaintiff.

Section 9–0501 NDRC 1943 provides as follows:

"Any benefit conferred or agreed to be conferred upon the promisor by any other person to which the promisor is not entitled lawfully, or any prejudice suffered or agreed to be suffered by such person, other than such as he, at

the time of consent, is lawfully bound to suffer as an inducement to the promisor, is a good consideration for a promise."

" 'Benefit' as a consideration to support a contract does not mean pecuniary gain arising out of the transaction, nor does 'detriment' mean pecuniary loss. 'Benefit' as used in this connection means that the promisor has, in return for his promise, acquired some legal right to which he would not otherwise have been entitled; 'detriment' means that the promisee has, in return for the promise, forborne some legal right which he would otherwise have been entitled to exercise. It is immaterial whether there is any actual pecuniary loss to the promisee or actual pecuniary benefit to the promisor; inadequacy of consideration does not render it insufficient." 12 Am.Jur., Contracts, Section 79.

"Consideration necessary to support a simple contract may be either a benefit conferred upon the promisor or a prejudice suffered or agreed to be suffered by the promisee." Baird v. Keitzman, 60 N.D. 317, 233 N.W. 905, 906.

Defendant was benefited by the combination or he would not have entered his corporation into it, in spite of the fact that by his agreement he was to deliver 3,600 shares of North American Royalties stock to plaintiff to consummate the combination, for without the agreement the plaintiff would not have entered his corporations into the combination.

█ Defendant raises the question that the agreement is void because it constituted a fraud on North American Royalties and consequently is against public policy. This contention is without merit due to the fact that North American Royalties issued no more of its stock to effect the combination than required by the appraiser's figures.

Section 32–0323, NDRC 1943, relative to damages for conversion of personalty provides as follows:

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"1. The value of the property at the time of the conversion, with the interest from that time; or

"2. When the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and

"3. A fair compensation for the time and money properly expended in pursuit of the property."

The action here was prosecuted with reasonable diligence and the plaintiff is entitled to the damages provided for under Paragraphs 2 and 3 of the quoted section.

During the course of the trial the parties stipulated that if plaintiff received a verdict the court could take testimony and render its decision as to the fair compensation for the time and money properly expended by plaintiff in pursuit of the property.

The order denying plaintiff's motion for judgment notwithstanding the disagreement of the jury is reversed. The order denying defendant's motion is affirmed. The case is remanded to the district court for entry of judgment in favor of plaintiff for the value of the stock converted and for such additional sum as the trial court, after hearing evidence, shall determine will compensate the plaintiff for the time and money properly expended in pursuit of the converted property.

SATHRE, C. J., and MORRIS, BURKE and TEIGEN, JJ., concur.

STRUTZ, J., deeming himself disqualified did not participate.