# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2185

_____

Virgil Wilkinson; Charles Wilkinson;    *
Alva Rose Hall; Wilbur D. Wilkinson,   *
for themselves and as heirs of Ernest   *
Wilkinson, Mollie Wilkinson, Harry   *
Wilkinson and Virginia Wilkinson,   *
                                    *

        Plaintiffs - Appellants,     *

                                    *  Appeal from the United States
     v.                             *  District Court for the District
                                    *  of North Dakota.
United States of America,         *
                                    *
        Defendant - Appellee.      *

_____

Submitted: June 20, 2005
Filed:  March 13, 2006

_____

Before MELLOY, HEANEY, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.


     The plaintiffs allege that they held current or prospective possessory interests in allotted Indian Trust Land.  They also allege that a Bureau of Indian Affairs (BIA) officer improperly leased the allotted land without legal authority and diverted a portion of the income from those unauthorized leases to the Farm Service

Administration (FSA)[1], a mortgage creditor. The plaintiffs present claims for damages under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), based on conversion and trespass. They also present direct claims against several federal employees under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), alleging procedural and substantive due process violations under the Fifth Amendment of the United States Constitution. The district court dismissed all claims on jurisdictional grounds, finding that the plaintiffs lacked standing. Because we conclude upon de novo review that the plaintiffs have standing, we reverse and remand for consideration of the claims on their merits.

I. Facts

A. The Underlying Debt

Ernest and Mollie Wilkinson, husband and wife, were registered members of the Three Affiliated Tribes of the Fort Berthold Reservation in North Dakota. They owned descendable possessory interests in allotted Indian Land held in trust for them by the BIA. Included among these lands were Allotments 3016 (a.k.a. Allotment 176A), 1366, 1357, and 371. Ernest and Mollie, through a family farming enterprise with their children, farmed these lands together with land that the children owned. Starting in the 1970s, Ernest and Mollie borrowed against their own land with mortgage loans from the FSA, and the Secretary of the Interior approved the mortgage loans.[2] Ernest and Mollie also executed assignments of income from trust land for all land that they owned on the Fort Berthold Reservation. Ernest and Mollie repeatedly

_____

[1]Under a 1994 reorganization, the FSA succeeded the Farmers Home Administration. Some of the loan agreements and letters referenced in this opinion preceded the 1994 reorganization. Nevertheless, we refer to the two organizations as the FSA.

[2]As discussed infra, 25 U.S.C. § 483a permits individual Indian owners to encumber their allotted trust land with mortgages.

-2-

rescheduled their mortgage debt. They also received a substantial write-down of the outstanding balance on their mortgage debt in 1990. It is undisputed that, at all times relevant to this case, the amount of the outstanding mortgage debt exceeded the value of the land. It is also undisputed that the mortgages gave the FSA the right, through the proper legal channels, to "take possession of, operate or rent the property" or to foreclose upon the mortgage.

B. Succession of Interests in the Land

Mollie died in 1991. The Department of the Interior probated her estate and, in 1993, ordered the Superintendent of the Fort Berthold Reservation to distribute her real property in part to her husband Ernest and in part to two of her children, Harry and Virginia Wilkinson. Ernest was to receive Allotment 1366 consisting of five acres. Harry was to receive Mollie's interest in Allotment 176A consisting of 133.42 acres. Virginia was to receive Allotments 371 and 1357 collectively consisting of 80 acres. Virginia and another child, Charles D. Wilkinson, were to receive the rest and residue of Virginia's estate. The plaintiffs allege that the Superintendent failed to carry out the final probate order and that distribution under Mollie's estate never occurred. The defendants do not appear to contest this fact. An Individual Indian Money account held by the BIA in Mollie's name remains open.

In 1994, Harry died. His estate was probated in 1997, and it was determined that Ernest was Harry's sole heir. Accordingly, Harry's land passed to Ernest. Also, land that Harry did receive or should have received from Mollie's estate passed or should have passed to Ernest.

Ernest died on November 28, 1997. Probate proceedings regarding Ernest's estate were not commenced until 2003, after the filing of this action. Although the parties agree that probate is still open on Ernest's estate, the plaintiffs allege that Ernest's heirs are Virgil, Charles, and Wilbur Wilkinson.

Virginia Wilkinson died November 27, 1998. The final probate order for Virginia's estate issued in 2003. This final order directed the distribution of her property in equal shares to six relatives, including plaintiffs Wilbur, Charles, and Virgil Wilkinson and plaintiff Alva Rose Hall.

C. The FSA's Demands and the BIA's Actions

In 1980-82, 1984-88, and 1991-92, the FSA sent letters to the BIA requesting payment under the assignments of income from trust property that Ernest and Mollie had executed. The plaintiffs do not allege that the BIA took action to assist the FSA until approximately November 1992, when the BIA placed holds on Ernest's and Mollie's Individual Indian Money accounts. Although the FSA communicated with the BIA, it does not appear that the FSA declared any of the loans to be in default, accelerated the balance due, or made demands to the borrowers.

On January 10, 1994, the FSA again sent a letter to the BIA requesting payment under the assignments of income from trust property that Ernest and Mollie had executed. The January 10, 1994 letter from the FSA to the BIA listed the debtors as "Ernest Wilkinson and Mollie Wilkinson Est." The FSA sent the 1994 letter after the Department of the Interior had issued the final probate order in Mollie's estate. The FSA had not made a claim against Mollie's estate during the probate proceedings.

On August 5, 1996, the FSA sent a letter to the BIA asking for assistance in the collection of payments on the mortgage loans. The August 5 letter did not state that the Wilkinsons were in default on any mortgage nor demand that the BIA lease the mortgaged land to generate income. On February 19, 1997, the BIA's Superintendent for the Fort Berthold Reservation, Adeline Brunsell, advertised certain tracts of the mortgaged land for lease, with sealed bids to be opened on March 19, 1997.

-4-

On March 13, 1997, Superintendent Brunsell sent a letter addressed to Ernest and Mollie stating that the BIA intended to lease the land because the FSA had not been receiving payments to apply to the mortgage loans. On March 18, Ernest asked Superintendent Brunsell to remove the land from the lease offering and notified her that the land she advertised for lease included the homestead as well as land that the family was actively farming. On March 24, BIA employee Angus Fox, acting on behalf of Superintendent Brunsell, informed Ernest that the land would not be removed from the lease offering because the FSA had not been receiving payment on the mortgages.

On April 3, 1997, Ernest filed a notice of appeal with Superintendent Brunsell. Superintendent Brunsell refused to stay her decision to lease the land. On April 8, Ernest filed a notice of appeal with BIA Area Director Gary Foell. On June 20, 1997, Area Director Foell denied the appeal. On August 6, 1997, Ernest, along with the plaintiffs in this case, filed a notice of appeal with the Interior Board of Indian Appeals ("Interior Board").

In their brief to the Interior Board, the plaintiffs argued that Superintendent Brunsell had no legal authority to lease the lands or place holds on Ernest's and Mollie's money accounts, that Superintendent Brunsell failed to stay her decision as required under leasing regulations, and that her actions comprised a constructive foreclosure of the Wilkinsons' family farm. The plaintiffs also requested damages. No personnel from the BIA responded to the plaintiffs' brief to the Interior Board.

The FSA claims that it sent a notice of acceleration and demand for payment to Ernest and Mollie on October 9, 1997. Mollie had been dead for six years by this time and the final order in her probate estate was four years old. The plaintiffs claim that Ernest did not receive the notice.

In an order dated July 6, 1998, the Interior Board reversed the earlier decisions of Superintendent Brunsell and Area Director Foell and held that Superintendent Brunsell had no legal authority to lease the Wilkinson's land. The Interior Board stated that neither Superintendent Brunsell nor Area Director Foell had indicated their source of authority to lease the lands. The Interior Board stated that the only possible authority would have been 25 C.F.R. § 162.2(a)(3) or (5) (1998).[3] Those subsections provide, respectively, that the BIA may lease individually owned land for the benefit of undetermined heirs of an estate or for Indians who have given the Secretary of the Interior written authority to execute leases on their behalf. The Interior Board determined that because the 1993 probate order in Mollie's estate determined her heirs, subsection (a)(3) did not apply. Also, the Interior Board determined that subsection (a)(5) did not apply because the assignments of income "authorize[d the] BIA only to pay FSA from income from the trust property; it [did] not authorize [the] BIA to lease that property in order to generate income." Finally, the Interior Board held that it had no jurisdiction to award damages and remanded to the Area Director to address the issue of holds on the money accounts.

No party sought judicial review of the Interior Board's decision.[4] On remand, the Area Director held that because the BIA lacked the authority to advertise and lease the lands, the BIA also lacked the authority to place a hold on Mollie's account and lacked the authority to pay the FSA from the proceeds of the unauthorized leases. The Area Director ordered Superintendent Brunsell to carry out the orders from the

[3]The text of 25 C.F.R. § 162.2 (1998), as cited by the Interior Board, remains unchanged but was moved to 25 C.F.R. § 162.601 (2005). See 66 Fed. Reg. 7068-01 at 7123 (Jan. 22, 2001).

[4]In general, decisions of the Interior Board are final decisions of the Secretary of the Interior and are appealable in the district court. See, e.g., Oglala Sioux Tribe of Pine Ridge Indian Reservation v. Hallett, 708 F.2d 326, 333 (8th Cir. 1983) (affirming a district court's grant of summary judgment that upheld a final decision of the Secretary of the Interior as expressed in an Interior Board decision).

Interior Board and Area Director. Subsequently, Superintendent Brunsell failed to carry out the orders, continued the hold on Mollie's account, and, through 2003, continued to lease the lands and pay the FSA.

The plaintiffs filed an administrative claim under the Federal Tort Claims Act. The Department of the Interior denied the claim. On January 3, 2003, the plaintiffs filed this action in the district court. The plaintiffs alleged that Superintendent Brunsell's negligent acts caused a constructive foreclosure of the family farm, and the loss of their home and homestead, land, and farm equipment. They also alleged that stress from these events caused Ernest's death. The plaintiffs specifically alleged state law claims of conversion and trespass as well as Bivens claims against Superintendent Brunsell, Area Director Foell, and BIA employee Angus Fox. Because the plaintiffs only sued the defendants in their official capacities, the district court substituted the United States as the defendant pursuant to 28 U.S.C. § 2679(d)(2).

On August 18, 2003, the FSA filed a claim against Ernest's estate for the amounts due under the loans.

On April 14, 2004, the district court granted summary judgment in favor of the United States, finding that the plaintiffs lacked standing. En route to making this determination, the district court found that the mortgage agreements permitted the FSA to lease the land and that the plaintiffs had never held an interest in the land superior to the FSA. The district court did not treat the Interior Board's decision as binding, finding that the Interior Board's decision rested on the interpretation of the leasing regulations whereas the district court's decision rested on the interpretation of the mortgage agreements. Notwithstanding the fact that the FSA was neither a party to the Interior Board proceedings nor to this action, and notwithstanding the fact that no party had appealed the Interior Board's decision, the district court stated, "The Court finds that the July 1998 decision of the [Interior Board] failed to take into account the undisputed mortgage rights of the Farm Service Agency. Upon default,

the mortgage allows the FSA to take possession of the trust land <u>and</u> to rent the property." Ultimately, the district court concluded that the plaintiffs had no Article III standing because they held no property interest and could not prove an injury in fact.

II.

Before we address the issue of standing in detail, we are compelled to note a few serious concerns raised by the BIA's underlying actions in this matter and by the government's position on appeal.

First, we are troubled by the government's insistence that we focus exclusively on the FSA and its position as lienholder over the allotments. The original named defendants in this case were employees of the BIA, not employees of the FSA. The BIA has a fiduciary obligation to Indian landowners to hold allotted Indian Lands in trust. The BIA's authority as trustee is limited by statute. The fiduciary obligation does not disappear when the Secretary of the Interior approves a mortgage covering the allotted land, and the BIA does not become a trustee on behalf of mortgage creditors. Rather, the BIA is first and foremost the trustee for the Indian landowners. The BIA is not related to the FSA, owes no general fiduciary obligation to the FSA, is not controlled by regulations that govern the FSA, and is subject to its own set of governing regulations. The BIA is no more entitled to deal with the FSA on an informal basis to satisfy the FSA's claims outside judicial proceedings than a trustee at a bank is entitled to casually transfer property from the trust department to the loan department when a loan officer becomes nervous or loses confidence in a debtor's ability to pay.

Second, on appeal and apparently at all stages prior to appeal, the government has taken an overly simplistic, "ends justifies the means" view of the facts. The government characterizes this case as a dispute over the disposition of rental proceeds.

This case, however, is not merely a dispute about the disposition of rental proceeds. This case involves the dispossession of real property. The Interior Board made this point clear in its opinion. Supervisor Brunsell ignored this fact below, and the government ignores this fact on appeal. The government recites the assignment of rents language from the agreement, notes that the FSA perfected the assignment of rents under North Dakota law, and claims that this process gave the *BIA* authority to seize and lease the land. The government's position amounts to an assertion that because the debt exceeded the value of the mortgaged land, the plaintiffs did not have a legally cognizable interest, the BIA was free to ignore its duties as trustee, the applicable leasing regulations were irrelevant, and the land could be taken without honoring applicable state law procedural safeguards that were intended to protect mortgagors.[5]

---

[5]Although the government argues that the loan and assignment documents provided for this "self-help" remedy, the controlling federal law that authorizes mortgages on allotted Indian lands makes clear that tribal law (if any) or state law limits the availability of foreclosure or sale. 25 U.S.C. § 483a provides:

(a) The individual Indian owners of any land which either is held by the United States in trust for them or is subject to a restriction against alienation imposed by the United States are authorized, subject to approval by the Secretary of the Interior, to execute a mortgage or deed of trust to such land. Such land shall be subject to foreclosure or sale pursuant to the terms of such mortgage or deed of trust *in accordance with the laws of the tribe which has jurisdiction over such land or, in the case where no tribal foreclosure law exists, in accordance with the laws of the State or Territory in which the land is located.* For the purpose of any foreclosure or sale proceeding the Indian owners shall be regarded as vested with an unrestricted fee simple title to the land, the United States shall not be a necessary party to the proceeding, and any conveyance of the land pursuant to the proceeding shall divest the United States of title to the land. All mortgages and deeds of trust to such land heretofore approved by the Secretary of the Interior are ratified and confirmed.

This view is flawed for many reasons. Primary among those reasons is the fact that self-help is rarely an available remedy for a creditor when the collateral at stake is real property. The government has identified no authority that would permit a mortgagee to take possession of encumbered real property outside of judicial proceedings to generate rents. In short, the government has presented no authority to show that the possession provisions of the assignment of rents could be enforced outside the judicial process.

The problem in this case is compounded by the fact that certain BIA employees ignored orders from their own agency. Had the BIA not been burdened with a trustee's fiduciary obligations and had the collateral been personal property rather than real property, this case might be different. As it stands, however, the unappealed

_____

Id. (emphasis added).

There is no applicable tribal foreclosure law in this instance, so North Dakota law applies. Under North Dakota law, a mortgagee is entitled to a right of redemption during a redemption period. N.D. Cent. Code §§ 28-24-02 & 32-19-01 (1997). Also, the government has identified no authority under North Dakota law authorizing a mortgagee to take possession under an assignment of rents outside judicial proceedings. As a matter of public policy intended to prevent desperate borrowers from waiving valuable rights when trying to secure a loan, North Dakota does not permit borrowers to waive redemption rights prior to foreclosure. See, e.g., First State Bank of New Rockford v. Anderson, 452 N.W.2d 90, 92 (N.D. 1990) (explaining that a mortgagor may not "bargain away" his or her redemption rights). Accordingly, as a matter of law, no provisions in the loan documents or assignments of trust income that Ernest and Mollie executed could have suspended the application of North Dakota's law governing redemption rights nor waived a debtor's protection against extrajudicial appropriation of mortgaged land. As such, the government's argument that the loan and assignment of income documents granted the FSA the right to take possession of the land fails. Further, the government's arguments in this regard are entirely misplaced as the plaintiffs have alleged that the BIA, not the FSA, constructively foreclosed on the family's land.

-10-

decision from the Interior Board[6] makes it clear that the BIA acted without lawful authority. Whether the FSA had an enforceable contract right to seize the land is beside the point. The plaintiffs brought this action against the BIA, and it is BIA employees that the plaintiffs allege committed torts and constitutional violations.

---

[6]The defendants have offered no argument to explain why the issues settled by the Interior Board's order should not be treated as res judicata in this case. As noted, BIA personnel and not FSA personnel were the originally named defendants. Accordingly, it is immaterial that the FSA might have had enforceable contract rights under the assignment of rents. The absence or presence of the FSA's contract rights have no bearing on the deference that the courts owe to unappealed agency decisions. The Interior Board's finding that the seizure and initial leases were wrongful and without legal authority is settled.

It does not follow, however, that the Interior Board's order foreclosed the BIA from exercising control over the land at *some point* following the deaths of Ernest and Virginia. By virtue of the BIA's duty as administrator of their estates, the BIA may have later become vested with authority to lease the lands. See 25 C.F.R. § 162.601(a)(3) (authority to lease land for undetermined heirs). However, we do not have sufficient facts before us at this time to determine whether the Interior Board's order precluded all leases in this case. Probate was not commenced for Ernest's estate until 2003, so it does not appear that the BIA gained authority to lease his land as administrator or executor. Probate was commenced for Virginia's estate at an earlier date, and the BIA may have acted lawfully when it leased lands from her estate. That does not mean, however, that the government was free to delay and extend probate for an unreasonable period of time.

As noted, we do not have sufficient facts before us to determine whether the Interior Board's decision serves as res judicata as to the leases for all years (and the parties have not briefed the issue). To guide the inquiry on remand, we note that the question is no longer whether BIA personnel acted with or without legal authority in their initial seizure and leasing of the land. The questions to be addressed are whether the initial actions of BIA personnel, taken without legal authority, comprised a federal tort or constitutional violation, and whether those actions remained devoid of authority for the entire term of the BIA's seizure.

-11-

Against this backdrop, we turn to our analysis of standing. Our review is de novo because this case comes to us following a grant of summary judgment and because the question of Article III standing is a question of subject matter jurisdiction that we resolve as a matter of law. Young Am. Corp. v. Affiliated Computer Servs., Inc., 424 F.3d 840, 843 (8th Cir. 2005) ("If a plaintiff lacks standing, the district court has no subject matter jurisdiction.") (citations and quotation marks omitted).

For a plaintiff to have Article III standing, there must be: (1) an injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) a likelihood that a favorable decision by the court will redress the alleged injury. Id. "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

As to the first and second elements, an injury in fact and a causal connection, it is clear that certain persons were deprived of a possessory interest in real property. Also, it is undisputed that the deprivation in this case occurred due to the challenged actions of the defendants. For standing purposes, then, the second element is satisfied. The first element is satisfied if the plaintiffs in this action were the persons deprived of an interest in real property or if they are entitled to represent persons deprived of an interest in real property.[7]

To determine whether the plaintiffs were deprived of an interest in real property, we need only trace ownership of the leased allotments to confirm that the plaintiffs received, or should have received, a possessory interests in those allotments. As set forth above, the identified allotments (allotments 3016, 1366, 1357, and 371) that were subject to the BIA's seizure and leasing should have passed to the plaintiffs

---

[7]As to the second possibility, the issue might more appropriately be characterized as prudential standing or a question of identifying the real party in interest rather than an issue of Article III standing. Because clear precedent guides our resolution, however, we need not split hairs over our labeling of this issue.

in this case. Delays in probate proceedings prevented these property rights from vesting in the heirs of Ernest and Virginia. The BIA continued to lease the lands well after probate should have been concluded and interests should have vested in the heirs. We refuse to allow the government to delay the disposition of estates and then rely on the consequences of those delays to claim that prospective heirs lack protectable interests.

Further, we have previously held that prospective Indian heirs had Article III "injury in fact" standing even though they suffered only injury to prospective possessory interests. See Irving v. Clark, 758 F.2d 1260, 1267 n.12 (8th Cir. 1985) ("the injury of loss of property (though not of a vested right to property) is sufficiently concrete since the ancestor through whom [the plaintiff] claims has died intestate and we know [the plaintiff] would have taken absent the operation of [the escheat provisions found in 25 U.S.C.] section 2206.").[8] The Supreme Court granted certiorari in Irving, and in Hodel v. Irving, 481 U.S. 704, 711-12 (1987), affirmed the finding of jurisdiction. There, the Court stated:

> For obvious reasons, it has long been recognized that the surviving claims of a decedent must be pursued by a third party. At common law, a decedent's surviving claims were prosecuted by the executor or administrator of the estate. For Indians with trust property, statutes require the Secretary of the Interior to assume that general role. 25 U.S.C. §§ 371-80. The Secretary's responsibilities in that capacity, however, include the administration of the statute that the appellees claim is unconstitutional, see 25 U.S.C. §§ 2202, 2209, so that he can hardly be expected to assert appellees' decedents' rights to the extent

___

[8]Irving v. Clark involved a challenge by Indian heirs to the escheat provisions of the Indian Land Consolidation Act (the "Consolidation Act"). The Consolidation Act was an attempt by Congress to control the fractionation of allotted Indian Land for which ownership had become so dispersed that many interests were economically insignificant. The plaintiffs in Irving v. Clark were heirs who sought compensation for fractional interests taken under the Consolidation Act.

-13-

that they turn on that point. Under these circumstances, appellees can appropriately serve as their decedents' representatives for purposes of asserting the latters' Fifth Amendment rights. They are situated to pursue the claims vigorously . . . .

In short, permitting appellees to raise their decedents' claims is merely an extension of the common law's provision for appointment of a decedent's representative. It is therefore a "settled practice of the courts" not open to objection on the ground that it permits a litigant to raise third parties' rights.

Id. (quoting Tyler v. Judges of Court of Registration, 179 U.S. 405, 406 (1900)).

We are confident that the Supreme Court's rationale as set forth above applies to the present facts. The Interior Board already determined that BIA personnel acted without legal authority. The BIA personnel refused to respect that decision and thereby deprived Ernest and Virginia and/or their heirs of possessory interests in the allotments or of rights provided as protection to debtors under North Dakota law.

All that remains is the question of whether a favorable resolution could provide redress for the alleged injuries. We have little difficulty finding this element satisfied. The plaintiffs alleged trespass, and the alleged trespass occurred via the BIA employees' willful violation of a clear order. Also, because the initial leases were without authority, a refund of lease proceeds to the heirs could provide at least partial redress. The fact that the FSA may have held a valid claim to rental proceeds is immaterial to the question of standing. The FSA is not a party to this action, and the BIA was without authority to seize the land and generate income to pay the FSA. The BIA risked liability when it seized the land and paid rents to the FSA, and repayment *by the BIA* may be part of an appropriate remedy. Also, court ordered disbursement of funds currently held in Indian Money Accounts for Ernest, Mollie, and Virginia is another element of a possible remedy.

In conclusion, all elements necessary to establish Article III standing exist, and as a matter of standing, prudential standing, or real party in interest, the present plaintiffs are entitled to pursue their claims.

The judgment of the district court is reversed, and this matter is remanded for further proceedings consistent with this opinion.

_____