# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1212

_____

Virgil Wilkinson, Charles Wilkinson, &ast;
Alva Rose Hall, Wilbur D. Wilkinson, &ast;
for themselves and as heirs of Ernest &ast;
Wilkinson, Mollie Wilkinson, Harry &ast;
Wilkinson and Virginia Wilkinson, &ast;
&ast;
   Plaintiffs–Appellees, &ast;
&ast; Appeal from the United States
  v. &ast; District Court for the
&ast; District of North Dakota.
United States of America, &ast;
&ast;
   Defendant–Appellant. &ast;

_____

Submitted: November 12, 2008
Filed: May 6, 2009

_____

Before MELLOY, BOWMAN, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

The United States appeals from several of the district court's adverse holdings following a bench trial on claims against the Government under the Federal Tort Claims Act ("FTCA"). Specifically, the Government appeals the district court's holding on conversion, its award of prejudgment interest, and its determination of non-economic damages based on intentional infliction of emotional distress. We

reverse with respect to liability and damages on the conversion claim and the award of prejudgment interest; we affirm the emotional-distress damages award.

I.

This case has been before us once before, and its earlier history can be found in more detail in our prior opinion, Wilkinson v. United States, 440 F.3d 970 (8th Cir. 2006). Briefly, the facts are as follows. Ernest and Mollie Wilkinson[1] owned several descendable possessory interests on allotted Indian land held in trust by the Bureau of Indian Affairs ("BIA"). During the 1970s and 1980s, the Wilkinsons mortgaged their allotments to what is now known as the Farm Service Administration ("FSA"). The Wilkinsons defaulted, and in 1990 the FSA wrote down their debt to the fair market value of the land. The Wilkinsons defaulted again and stopped making payments in 1992.

Mollie died in 1991, Ernest suffered a heart attack and a stroke in 1993, and one of their sons died in 1994. As a result, the Wilkinsons were generally unable to continue farming their land. In 1996, the FSA sent a letter to the BIA asking for aid in collecting on the Wilkinsons' debt. In response, the BIA advertised for lease bids for the Wilkinsons' land in February 1997. The Wilkinsons, however, asked the BIA not to lease the land because they intended to resume farming it that year. The BIA refused and leased out 315 of the Wilkinsons' 750 acres on five-year terms. With nearly half of their land leased against their will, the Wilkinsons abandoned their

---

[1]Ernest and Mollie Wilkinson had six children that joined in their farming operations, as well as other children who did not. The named plaintiffs in this case are the surviving four of those six. For convenience, we refer to the family generally, rather than by the individual relevant for any particular point of the proceedings.

remaining land and their farm equipment.[2]  At no point did the BIA take possession of the farm equipment or of the particular land upon which it was located.

The Wilkinsons had appealed the decision to lease their lands to the BIA's Superintendent for the Reservation, but their appeal had been denied.  The Wilkinsons appealed further, and in July 1998 the Interior Board of Indian Appeals ("IBIA") concluded that the BIA lacked authority to lease the allotments.  The BIA and the local superintendent ignored this ruling, however, and took no action to effectuate the IBIA's decision.  In 2002, the BIA leased out the allotments again, this time for two-year terms.

The Wilkinsons sued, claiming trespass, conversion, intentional infliction of emotional distress, and wrongful death of Ernest, who had died in 1998.  The district court granted summary judgment for the United States, holding that the Wilkinsons did not have standing to sue.  We reversed and outlined two issues for remand: "whether the initial actions of BIA personnel, taken without legal authority, comprised a federal tort or constitutional violation, and whether those actions remained devoid of authority for the entire term of the BIA's seizure."  Id. at 976 n.6.

After a bench trial on remand, the district court held that the BIA was without authority and that it trespassed from 1997 to 2003.[3]  Although there was some evidence that the BIA leased the land again after 2003, the district court found that the land was not leased and that it sat idle in 2004, 2005, and 2006.  The district court

---

[2]The singular exception appears to be one of the remaining allotments, for which the Wilkinsons negotiated a lease with a third party.

[3]Pursuant to 25 C.F.R. § 162.601(a)(3), the BIA does have authority to lease an allotment on behalf of the "undetermined heirs of a decedent's estate."  Several members of the Wilkinson family died during the relevant period, and the Government argued that some of the leases were proper under this authority.  The district court held otherwise, and the Government does not raise this issue on appeal.

held, however, that the BIA's trespass continued through 2006, because even though the land may not have been leased after 2003, there was no evidence that the BIA informed the Wilkinsons of this fact, and thus it was the BIA's fault the land remained idle. The district court also determined that lands the BIA never leased were not trespassed on. The district court further held that the BIA had converted the farm equipment through its trespass on the leased farm lands and the consequent "paralyzing" of the Wilkinsons' farming operations.

The district court also held that the BIA intentionally inflicted emotional distress on the Wilkinsons through its "extreme and outrageous disregard for our government's conflict resolution system" and by its continued defiance of the IBIA and of the Wilkinsons' rights, even while seeing the "great emotional angst" the BIA's actions caused the Wilkinsons. Finally, however, the district court found that the BIA was not responsible for the death of Ernest Wilkinson.

The district court assessed damages on the successful claims and adjusted the trespass and conversion damages to "present value" by using a 5% rate of return, resulting in a sum of $232,407.[4] The district court then reduced the total amount by $4,838 that the BIA had already paid to the Wilkinsons, resulting in a sum of $227,569 in economic damages. In determining non-economic damages for the intentional infliction of emotional distress claim, the district court awarded an additional "$232,407 for their emotional distress, an amount equal to the economic damages the Wilkinsons have endured."

---

[4]There is some discrepancy regarding whether the district court intended $72,000 or $78,000 to be the base figure for conversion damages. Because we reverse with respect to the conversion claim and the damages thereon, we need not consider which figure is appropriate.

We note at the outset that the Government does not appeal the district court's finding that the BIA trespassed on the Wilkinsons' property. Nor does it appeal the district court's holding that the court should assess non-economic damages for intentional infliction of emotional distress. The district court's finding as to the fair rental value for the trespass is not at issue, but the Government has appealed the adjustment of that amount to present value, contending that it is a prohibited award of prejudgment interest. In addition, the Government appeals the finding of conversion of the Wilkinsons' personal property as well as the amount of non-economic emotional-distress damages the court awarded.

A. Conversion

The district court concluded that the BIA's leasing of the Wilkinsons' allotments "had a paralyzing effect on their farming operation" and was therefore a conversion of the Wilkinsons' farming equipment. Under North Dakota law, "the trial court's determination about whether a conversion has been committed is a finding of fact." Paxton v. Wiebe, 584 N.W.2d 72, 79 (N.D. 1998). We review the district court's factual findings for clear error. Fed. R. Civ. P. 52(a)(6); Chapa v. United States, 497 F.3d 883, 889 (8th Cir. 2007).

"Conversion consists of a tortious detention of personal property from the owner, or its destruction, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner." Paxton, 584 N.W.2d at 78 (quotation omitted); see also Restatement (Second) of Torts § 222A(1) (1965) ("Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."). North Dakota courts have long recognized that conversion does not require that the defendant assert dominion over the property for his own benefit; rather, the defendant need only

interfere with the owner's interests to a sufficient degree. See, e.g., Christensen v. Farmers State Bank of Richardton, 157 N.W.2d 352, 357 (N.D. 1968) ("The gist of conversion is not in acquiring the complainant's property, but in wrongfully depriving him of it . . . and it is of little [relevance] that the converter received no benefit from such deprivation."). "[I]t is the degree of such interference which makes a conversion," William L. Prosser, The Nature of Conversion, 42 Cornell L.Q. 168, 172 (1956–57), and there is no conversion without "interfere[nce] with an owner's use *to an actionable degree*." Harwood State Bank v. Charon, 466 N.W.2d 601, 603 (N.D. 1991) (emphasis added). To reach an actionable degree, the interference must be "of such a degree as to require a forced sale of the plaintiff's interest in the goods to the defendant." Dairy Dep't v. Harvey Cheese, Inc., 278 N.W.2d 137, 144 (N.D. 1979).

As the underlying facts are not contested, the question before us is whether the BIA's leasing of the Wilkinsons' allotments, alone, was sufficient to constitute an "actionable degree" of interference rising to the level of a "forced sale" of the farm equipment to the BIA. The Restatement (Second) of Torts informs us that:

> In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important: (a) the extent and duration of the actor's exercise of dominion or control; (b) the actor's intent to assert a right in fact inconsistent with the other's right of control; (c) the actor's good faith; (d) the extent and duration of the resulting interference with the other's right of control; (e) the harm done to the chattel; (f) the inconvenience and expense caused to the other.

Restatement (Second) of Torts § 222A(2). Here, the BIA exercised no control over the farm equipment; the BIA did not assert any right over the farm equipment; the BIA did no harm to the farm equipment; and the BIA did not detain or directly interfere with the farm equipment, either physically or through the legal process. The inconvenience and expense caused were limited to the Wilkinsons' inability to use the equipment on the leased farm land. Even accepting the district court's conclusion that

-6-

leasing half of the land "paralyzed" all of the farming operations, such indirect and incomplete interference cannot support a claim of conversion.

The Wilkinsons cite no case where a court found conversion based solely on an indirect interference with a specific use of property and without interference with physical possession of that property. See generally W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 15 (5th ed. 1984) (hereinafter Prosser and Keeton). While there may be instances where interference with an owner's right to use his property may completely "deprive[] [the owner] of the possibility of any enjoyment thereof or benefit therefrom" even without interference with possession, Leach v. Kelsch, 106 N.W.2d 358, 364 (N.D. 1960) (quotation omitted), conversion is primarily "an offense against *possession* of property" that "consists of an act in derogation of the plaintiff's *possessory* rights." Id. at 363–64 (quotations omitted) (emphasis added); see Dairy Dep't, 278 N.W.2d at 144 ("Conversion is a tort having its origin in the old common law of trover" and "is generally committed by an unauthorized transfer or disposal of possession of goods to one who is not entitled to them."). Thus, few interferences will amount to conversion if they do not interfere with the possessory interest, and it remains the case that "where there is no denial of plaintiff's property, and no claim of property in the defendant, there can be no conversion." Nye v. Johnson, 4 N.W.2d 819, 821 (N.D. 1942); cf. Paxton, 584 N.W.2d at 79–80 ("Even where the tenant alleges that he was wrongfully evicted, the landlord is not liable in conversion for taking from the premises personalty belonging to the tenant, where the landlord in no way exercises dominion over the personal property in derogation of the tenant's rights." (quotation omitted)).

At common law, there is a separate claim for "trespass to chattel" that is generally regarded as differing from conversion only in degree, and where interference is not complete, trespass to chattel may be a more appropriate claim. See Pearson v. Dodd, 410 F.2d 701, 706 (D.C. Cir. 1969) ("Where the intermeddling falls short of the complete or very substantial deprivation of possessory rights in the

property, the tort committed is not conversion, but the lesser wrong of trespass to chattels."); Restatement (Second) of Torts § 222A cmt. a (explaining that "the present rule . . . regards conversion as an exercise of the defendant's dominion or control of the chattel, as distinguished from a mere interference with the chattel itself, or with possession of it"). Compare N.D. Cent. Code § 32-03-23 (regarding damages for conversion) with id. § 32-03-09.1 (regarding damages for injury to property).

Because a conversion must be the equivalent of a forced sale to the defendant, the tort of conversion is more severe than the tort of trespass to chattel, which generally is something less than a forced sale justifying payment of full value of the chattel. See Restatement (Second) of Torts § 222A cmt. c ("Usually, although not necessarily, [trespass to chattel] damages are less than the full value of the chattel itself. In conversion the measure of damages is the full value of the chattel, at the time and place of the tort."). The "forced sale" nature of conversion emphasizes the essential distinction between conversion and trespass to chattel; namely, in a conversion, the interference is so severe as to justify the serious remedy of payment of the *full value* of the chattel. See Buri v. Ramsey, 693 N.W.2d 619, 625 (N.D. 2005) (describing the statutory "presumption that the detriment caused by the conversion equals the value of the property" (quotation omitted)). It follows, then, that a claim of conversion cannot stand where the interference is too incomplete to totally deprive the plaintiff of the chattel. Prosser, The Nature of Conversion, supra, at 173 ("Conversion has been confined, in effect, to those major interferences which are so important, or serious, as to justify the forced judicial sale of the chattel to the defendant which is the distinguishing feature of the action.").[5]

---

[5]As to a claim for the lesser-interference tort of trespass to chattel, a theory not argued here, we note that where there has been no dispossession of the property, "liability for trespass to chattels exists only on a showing of actual damage to the property interfered with." Pearson, 410 F.2d at 707 (citing F. Harper & F. James, The Law of Torts § 2.3 (1956)); Prosser and Keeton, § 14 at 87 ("[I]n the absence of any actual damage the action will not lie."). The Wilkinsons were not dispossessed of

Our conclusion that no conversion occurred is further supported by the fact that the district court did not appear to consider ownership of the equipment to pass to the BIA (as it would if converted for full value), because, under North Dakota law, a plaintiff may be awarded *either* the value of the property *or* the return of the property. See N.D. Cent. Code § 32-03-23; Buri, 693 N.W.2d at 626 ("If the owner elects a return of the converted property, the present value of that property must be considered in mitigation of damages . . . ."). Allowing the Wilkinsons to both retain the farm equipment and receive the full value of the farm equipment would be contrary to the notion of a "forced sale" and inconsistent with North Dakota law.

We cannot justifiably expand the scope of North Dakota's law of conversion to treat the interference here as being so complete so as to be a forced sale requiring additional damages equal to the full value of the farm equipment. See Ashley County v. Pfizer, Inc., 552 F.3d 659, 673 (8th Cir. 2009) ("It is not the role of a federal court to expand state law in ways not foreshadowed by state precedent, and our review of related [state] case law does not foreshadow such an expansion." (alteration and citations omitted)). In considering the district court's holding that the BIA's trespass had the secondary effect of converting the farm equipment, we are "left with a definite and firm conviction a mistake has been made." Paxton, 584 N.W.2d at 79 (standard of review).

B. Prejudgment Interest

The Government also contests the district court's increase of damages to reflect "present value," because the United States cannot be held liable for prejudgment interest on claims under the FTCA. 28 U.S.C. § 2674. The Wilkinsons do not deny that the present-value adjustment is an award of prejudgment interest; rather, they

---

their farm equipment, and the BIA caused no damage to the farm equipment; therefore, no trespass to chattel claim could stand.

contend that such interest is allowed as "just compensation" under the Fifth Amendment. See U.S. Const. amend V. Despite the Wilkinsons' claims, the district court did not "make clear that this case involved taking of private property by the Government." To the contrary, the Wilkinsons do not argue a Fifth Amendment claim, and there is no indication that the district court considered a constitutional violation. The damages were clearly based on North Dakota tort law under the FTCA, and accordingly no prejudgment interest may be awarded. Cf. Washington v. Drug Enforcement Admin., 183 F.3d 868, 873 (8th Cir. 1999) ("[C]onstitutional wrongs cannot be remedied through the FTCA.").

C. Non-Economic Damages

Finally, the Government argues that the district court determined the non-economic damages simply by doubling the economic damages, with no independent basis for its calculation, and therefore the non-economic damages must be revised downward to reflect all reductions from the initial $232,407 economic-damages calculation. We review a district court's calculation of non-economic damages under the FTCA for abuse of discretion, and "we must defer to the district court's assessment of damages unless there is plain injustice or a monstrous or shocking result." St. John v. United States, 240 F.3d 671, 678 (8th Cir. 2001) (internal quotations omitted). Damages are determined according to the relevant state law, except that punitive damages are not allowed under the FTCA. 28 U.S.C. § 2674; St. John, 240 F.3d at 679.

The Government's argument rests primarily on the underlying assertion that "non-economic damages were calculated solely as a function of economic damages" with "no independent basis in the record." We disagree with this fundamental premise of the Government's argument. The district court's comment that the non-economic damages were "an amount equal to the economic damages the Wilkinsons have endured" was not a holding that emotional damages were to be determined by the

-10-

economic damages. The emotional distress damages were not based on the economic loss of the trespass and alleged conversion. See Dahlen v. Landis, 314 N.W.2d 63, 68 (N.D. 1981) ("[T]he determination of damages for pain and suffering and comparable losses is not susceptible of an arithmetical calculation."). Rather, the district court based the damages on the "stress, frustration, and anger the Wilkinsons must have felt towards the BIA, an agency that is supposed to act as their fiduciary" but instead "openly ignored what may have been in the best interests of the family" and "demonstrate[d] a completely willful and arrogant defiance of our country's administrative and judicial process." The district court properly based the non-economic damage award on the ongoing anguish the BIA caused the Wilkinsons, anguish amplified by the BIA's position of power over the family. See Swenson v. N. Crop Ins., Inc., 498 N.W.2d 174, 185 (N.D. 1993) ("The position of the parties is relevant when examining the facts for instances of extreme and outrageous conduct."); see also Zuger v. State, 673 N.W.2d 615, 622 (N.D. 2004) ("[T]he degree of outrageousness of a defendant's conduct may itself be important evidence of severe emotional distress necessary to support a claim for intentional infliction of emotional distress." (quotation omitted)). Our reversal of the district court's conversion holding in no way changes the "stress, frustration, and anger" the BIA caused.

Similarly, the Government's argument that the emotional-distress damages must be reduced by the amount of rent the BIA paid to the Wilkinsons must also fail. Although it may be that receiving some small portion of the amount owed reduced the emotional distress by a like amount, such a reduction is not, as the Government argues, "mandated by law and logic."

Given the prolonged and obstinate abuse of power by the Wilkinsons' fiduciary, the BIA, we cannot say that the district court abused its discretion or assessed a "shocking" level of non-economic damages, even after a portion of the related economic damages are removed from consideration.

\* \* \*

For the foregoing reasons, we reverse the district court with respect to the conversion claim, damages thereon, and the calculation of prejudgment interest, and we affirm the emotional-distress damages award. Accordingly, the economic-damages award is reduced from $227,569 to $85,904, resulting in the total damages award being reduced from $459,976 to $318,311. We remand the case to the district court for entry of an amended judgment consistent with this opinion.

_____